Good morning, Your Honors, and may it please the Court. My name is Harini Raghupathy from the Federal Defenders of San Diego. On behalf of the appellant, Mr. Paulino Herrera-Hernandez. Mr. Herrera's 2008 expedited removal order violated due process and the applicable regulations in two different ways. First, the government failed to advise Mr. Herrera of the charges that were lodged against him contained on the Form I-860. And second, the government failed to provide Mr. Herrera necessary interpretive assistance in his native language of Mixteco. So let's get the first one out of the way quickly because I actually think that's a really weak argument for you. How would you distinguish Barajas Alvarado? Is that the case? It's note 12 in that case. It seems to me identical in terms of the circumstances that we face here where you didn't put on, or I don't know if it was you, but your client didn't put on any evidence to establish that the agent in fact did not read him the charges. Well, I would distinguish Barajas Alvarado because Mr. Herrera did submit, he didn't testify in court at the evidentiary hearing, but he did submit a declaration in which he said that the officer didn't explain to him that he was in formal removal proceedings and would be ordered removed from the United States. And the Form I-860 is the only form in the expedited removal proceedings where the charges and the specific factual allegations that give rise to the determination of inadmissibility are contained. Right, and the regulations require the agent before taking the sworn statement to read whatever the allegations are as to why the person is inadmissible and to get their response. So in the absence of any other evidence, we would assume that the agent followed the regulations there. You had an opportunity to cross-examine the agent on this point and failed to. So there's zero evidence that the agent failed to follow the regulations, and I think that's the same circumstance that existed in that other case. Well, if the court believes this case is controlled by Barajas Alvarado, then I would move to our second point, which is that Mr. Herrera was undisputedly not provided an interpreter in the Mixteco language, and Officer Lopez instead conducted the proceedings himself in the Spanish language, and that was violating Mr. Herrera's due process rights, and the expedited removal regulations would say that interpretive assistance should be provided to communicate with the alien if necessary. Was that issue raised in the district court? It was, Your Honor. That was the central issue that was litigated during the evidentiary hearing and the issue that Judge Burns focused on during the motion to dismiss. He made findings on it. He did, Your Honor, and he found that Officer Lopez's testimony that he followed standard DHS protocol, he deferred to that, and that protocol was supposedly that if an alien exhibited any sign of non-comprehension or some sort of language barrier, that the officer would immediately halt the proceedings and use the telephonic translation line to contact an interpreter. But there are two clear indications in the record that that finding and Judge Burns's decision to credit Officer Lopez was clearly erroneous. First, I would point the court to ER 33, and that's the jurat for the record of sworn statement, and the very first question that Officer Lopez asked Mr. Herrera on that jurat was, why did you leave your home country or country of last residence? That question would seemingly call for some type of explanation or elaboration, but Mr. Herrera nonsensically said no. So that should immediately have been a red flag to Officer Lopez that there was some sort of communication barrier and possibly a language difficulty. But Officer Lopez didn't follow his supposedly standard protocol of stopping the proceedings then and there and calling a mixteco interpreter or seeing if an interpreter was necessary. He simply continued to ask questions and record Mr. Herrera's responses. So that, I think, is clear evidence that Officer Lopez didn't follow supposedly standard DHS practice on this occasion. And then we have a second indication that Judge Burns's findings were clearly erroneous, and that's on page 111 of the ER, and this is transitioning into the 2014 criminal case. Mr. Herrera was interrogated by another DHS-trained official, Agent Barba de la Cruz, and despite his difficulty communicating with her, he was able to tell her that he identified as mixtec. She clearly understood the significance of his response. He repeated it back to him saying, oh, mixteco, and she testified at the evidentiary hearing that she was fully aware that he was having difficulty understanding some of her questions. But despite recognizing that he self-identified as mixteco, despite knowing that mixteco is an indigenous language that is spoken in Guerrero, which is where Mr. Herrera said he was from, and despite recognizing that he was having trouble communicating with her, she again didn't stop the proceedings and call an interpreter. She continued to trudge forward in Spanish. So that's another indication that a second-trained DHS individual did not follow the supposedly standard protocol in Mr. Herrera's case. And lastly, I would just suggest that the district court here was focused primarily on the due process violation. It didn't consider the issue of prejudice in this case, which would be whether Mr. Herrera was a plausible candidate for withdrawal of his application for admission. And under this court's precedent, in Melendez-Castro, in Tayar Escalon, and Leon Paz, generally the court would remand to the district court so that it could conduct that fact-intensive prejudice inquiry in the first instance. And I'd like to reserve the remainder of my time if there are no further questions. Thank you. You said you wanted a remand to district court, is that right? Yes, Your Honor, to conduct the prejudice inquiry in the first instance. Where is Mr. Herrera-Hernandez now, do you know? He got a five-year term of probation, and he was deported to Mexico shortly after he was sentenced. What do you envision a remand, and how would that go? I believe the government would have the opportunity to parole Mr. Herrera in, in order for the district court to determine whether there would be a hearing, essentially, in district court for the lawyers to argue whether he would be a plausible candidate for withdrawal of his application for admission. Are his whereabouts known? I've been in contact with the client, but I don't know his precise location. Thank you. Thank you. May it please the Court, J. Krishnamurthy for the United States. It seems like the Court understands our position on the Form I-860 issue, so if I could start with a language issue. This is frankly a case where both the evidence presented to the district court and the applicable standard of review are important. Mr. Herrera-Hernandez asked the district court to find that he didn't speak Spanish in 2008 and that his requests for an interpreter were ignored. There's no recording of the 2008 interview, so instead what the district court judge had available to him was a declaration from Mr. Herrera-Hernandez saying that he didn't speak Spanish and that his requests were ignored, the testimony of the officer who conducted the removal proceeding, which the district court found credible, and a video of an approximately 20-minute conversation between Mr. Herrera-Hernandez and an immigration officer in 2014, which shows Mr. Herrera-Hernandez speaking Spanish. Well, not very well. I didn't watch the tape. I don't speak Spanish, but I read the transcript, and my goodness. You'd have to concede that that's a pretty disastrous attempt for two people to communicate with one another, wouldn't you? And the district court recognized that as well. He recognized that there were instances in which questions had to be clarified or repeated, and there were also instances in which Mr. Herrera-Hernandez did not seem to ultimately understand the question. Not at all. And the agent was just like, what? No, no, no, that's not what I'm talking about. I'm trying to ask you this. And then he still apparently didn't comprehend at least the, you know, I mean, some pretty key concepts, right? Well, by my count, there's only two questions in which Mr. Herrera-Hernandez never seemed to understand what the agent was asking. Oh, I think there are definitely more. I didn't actually bring the hard copy. There are definitely more than that. I'm actually just thinking at the very end where he's finally asked, I think, do you fear going back? And I don't know, just trying to get, like, what's the basis for your fear? And at least the transcript doesn't give any meaningful response to that question. I gather that there was some, somehow someone was able to piece together, had something to do with his wife and kids. But the translator, who I gather speaks Spanish, is often just reduced to putting in unintelligible because I gather that probably the language that was being spoken wasn't understandable to a Spanish speaker. Correct. And on that point, it appears what Mr. Herrera-Hernandez said was something about his wife and children. The officer testified that that was a response that she had heard before, that someone was afraid of going back to the country of origin because they couldn't support their family financially. I'm talking about the translation. Again, I didn't listen to the tape. It wouldn't do me any good. But I'm saying the translation, just I can't remember what it said, but he's asked that question and gives some completely non-responsive answer at first, and then the rest is just unintelligible. That's correct. But the standard that this Court applies in finding that instances of language-based miscommunication rise to the level of a due process violation is something higher than that there are instances of language-based miscommunication. For example, in Perez-Laster, this Court found that there was a due process violation because the petitioner in that case repeatedly said that he could not understand the proceedings and he was prevented from explaining the evidence in his favor, which also led to an adverse credibility finding against him. In this case, Mr. Herrera-Hernandez never said that he didn't understand Spanish. He told the officer where he was coming from and where he was going. He told the officer that he understood each of his Miranda rights when they were explained to him individually. He told the officer that he understood that he was going to be prosecuted for a crime. So under those circumstances, there's simply no indication that he didn't understand the proceeding he was in or was prevented from explaining something to the officer. But there, I mean, I'm just thinking, I think it's from the 2014 transcript, there's just basic questions like how did you, isn't there, like, how did you get over the wall or something, or how did you get, I mean, it just gives these nonsensical answers, which clearly show that he doesn't know what the agent is asking him. And it was really, I mean, you're going to say, well, but she was able through persistence to get clarification. But actually, I think she just gave leading, she just, you know, asked him leading questions and he would just finally just say yes or no. Well, on that specific point, I believe the questions were, how did you enter the United States? And Mr. Herrera-Hernandez said both at the booth and over the hill. And the officer later testified that there is a toll booth in the hills. And so that actually wasn't a nonsensical response. What about the wall or the fence or something? Something else that was totally nonsensical. There was a question about how he crossed the fence, and I don't believe that Mr. Herrera-Hernandez ever gave a coherent response to that question. But taking, but again, under, there's no indication from that transcript, despite those instances of language-based miscommunication, that Mr. Herrera-Hernandez did not have a fair opportunity to relate his version of events. He told the officer that he wanted, that he was willing to speak with her. He told her that he didn't have valid entry documents. And so taking that transcript together with the credibility finding of the officer who conducted the immigration proceeding in 2008, the district court's findings on this issue are just not clearly erroneous. Very briefly on the prejudice issue, it's true that the district court did not specifically address the prejudice issue. But Mr. Herrera-Hernandez's attorney, before the district court made that statement, that he wasn't going to address prejudice, made clear that she had introduced all the evidence that there was. And we don't think that a remand is necessary in this case because the evidence introduced is simply insufficient as a matter of law. So the key inquiry here is whether or not the six factors in the INS inspector's field manual would weigh in favor of the plausibility of relief. And Barras Alvarado makes clear that something in those six factors has to weigh in favor of relief. That is, plausibility is something more than possibility. So in this case, the parties don't dispute that the first five factors taken together on balance do not favor relief. The only dispute is whether the sixth factor, humanitarian considerations, do. And so while it's true that in Ray Evaca, that sixth factor was allowed to tip the scales, that was quite a different situation than the one that we have here. The defendant in that case had lived in the United States almost his entire life, had a U.S. citizen wife and children, and had a number of other family members. And in holding that that situation was enough to tip the scales, Ray Evaca made clear that was because preserving family unity has a very high status in American law and immigration law in particular. Economic considerations don't have the same consideration because most people that come here, either legally or illegally, do so to improve their economic status. And there's also one important practical difference as well, and that the only evidence on this point is that Mr. Herrera-Hernandez said that he earned a certain amount of money as a field worker in Mexico. That point is neither, for all practical purposes, confirmable by Mr. Herrera-Hernandez or disputable by the United States. And so if that were enough to tip the scales, then anyone could establish the possibility of relief in the situation. If there are no further questions. Thank you very much. All right, thanks very much. You have some time for rebuttal. First, I just would dispute the government's characterization that Mr. Herrera was able to communicate sufficiently with either Officer Lopez or Agent Barbara La Cruz. The hallmarks of noncomprehension that this court has looked at include unresponsive answers and expressions of difficulty understanding what was asked of the alien. And here, the record is replete with those things. So in the 2014 post-arrest interrogation, Mr. Herrera-Hernandez is asked what country he's a citizen of. He doesn't understand. He has to be asked three or four times until Agent Barbara La Cruz essentially spoon-feeds him the answer and says, are you Mexican? Even then, he doesn't say yes. He says, I'm mixteco. Then again, once she defines what a citizen means to him, she starts to ask him about his family's citizenship. And if he understood the definition of citizenship, one would assume that he would respond saying that his parents were both Mexican. But again, he doesn't provide that response. He's asked, when did you enter the United States? And he replies with a frequency, two, as opposed to a time. He's asked, how did you get over the fence? He then nonsensically says, well, then I climbed the hill. Those are instances of unresponsive answers. There are also instances where he doesn't understand what was said to him. So when he's first asked if he understands his rights, he says no. And Agent Barbara La Cruz does go through them individually, and he says yes. But again, it's unclear whether he's saying yes because he actually understands them or because he essentially knows the words yes and no, and he's taking a shot in the dark at this point. He's asked why he's afraid to return to Mexico, and he repeatedly doesn't understand the question. And then he provides a response which isn't recorded in the post-arrest interrogation, but then we see in the record of sworn statement that he talks about his wife and kids. And I think that point is interesting because the expedited removal regulations also state that if an alien expresses a credible fear, that they should be referred to an asylum officer for a credible fear determination. But Agent Barbara La Cruz completely ignores the fact that Mr. Herrera says that he's afraid to return because he has a wife and kids, which suggests that this agent wasn't necessarily that steadfast in following the DHS regulations, the asylum regulation, as well as the regulation about contacting an interpreter. And then lastly, I would just say that she used leading questions several times in order to secure a responsive answer from Mr. Herrera. So when he wasn't able to explain when he entered the United States, she had to revert to essentially explaining the days of the week to him. So she said, well, today is Saturday, so when did you enter the United States? And so this is kind of the communication you would have with, you know, a young child in order for them to understand what's going on. It's not the level of communication that should satisfy due process in expedited removal proceedings, especially when there's no administrative or judicial review of these proceedings provided for in the statute. If there are no further questions. The only other question I'd ask is just, is there any basis to infer here that maybe your client spoke better Spanish in 2008 than he did in 2014? In 2000, I think no, Your Honor. And the reason I would say that was because we know from the record that Mr. Herrera was in Mexico working in the fields for three continuous years leading up to his 2014 removal. I thought he worked in the fields from 2005 to 2008. And I thought he said that's where he learned to speak all the Spanish he knew. So is there an inference that perhaps his Spanish was a little bit better in 2008? Because we have the interview, and I agree with you, that interview is not, you know. Right. So there is an inference, but I think that inference is rebutted by the fact that Mr. Herrera then was deported to Mexico and for the three years leading up to his arrest in the case prior to this case, which is where the interrogation occurred, he was also working in the fields in Mexico and also exposed to Spanish being spoken around him. So presumably, if anything, that second time hearing Spanish would make his abilities stronger. Okay, great. Thanks very much. The case just argued will be submitted. Thank you.
judges: Tashima, Silverman, Watford